DONALD E. MILLER
Graves, Miller & Kingston, P.C.
408 West 23rd Street
Cheyenne, WY 82001
(307) 638-8885
Attorney for Plaintiff

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

JAN - 2 2008

Stephan Harris, Clerk
Cheyenne

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

TOMMIE C. DRAPER, )
 )
    Plaintiff, )
 )
v. ) Civil Action No. 08CV 006 D
 )
BLACK HILLS CORPORATION, a South )
Dakota corporation, CHEYENNE, LIGHT, )
FUEL & POWER, a Wyoming Corporation, )
WAYNE ALAN DIXON, TED MASSEY, )
STUART WEVIK, JAMES M. MATTERN, )
KEVIN HAHN and JOHN DOES 1-8, )
 )
    Defendants. )

## COMPLAINT

**COMES NOW** the Plaintiff Tommie C. Draper, by and through his attorney, Donald E. Miller of Graves, Miller & Kingston, P.C., and for his Complaint against the above-named Defendants, states and alleges as follows:

### PARTIES

1.    The Plaintiff is a citizen of the State of Wyoming and resides in Laramie County, Wyoming.

2.    The Defendant, Black Hills Corp., now known as Cheyenne, Light, Fuel & Power, (Defendant Company) is and was a corporation organized and existing under and by virtue of the laws of the State of Wyoming and licensed to conduct a utility services in the State of Wyoming.

Receipt # Chy00 3527
Summons: _X_ issued
          ____ not issued

3. During all times pertinent hereto, Defendant James M. Mattern was Senior Vice President of Human Resources for Defendant Company.

4. During all times pertinent hereto, Defendant Stuart Wevik was the Vice President of Retail Operations for Defendant Company.

5. During all times pertinent hereto, Defendant Ted Massey was the Director of Retail Electric Distributions for Defendant Company.

6. During all times pertinent hereto, Defendant Wayne Alan Johnson was the Electrical Operations Manager for Defendant Company.

7. During all times pertinent hereto, Defendant Kevin Hahn was an employee of Defendant Company as well as the Functional Apprentice Representative (FAR).

## JURISDICTION AND VENUE

8. Plaintiff brings this action pursuant to the provisions of Title VII of the Civil Rights Act of 1964 pursuant to 42 U.S.C.A. § 2000e, et. seq.

9. On October 3, 2005, Plaintiff filed a verified complaint with the State of Wyoming Department of Employment.

10. On September 27, 2007, the United States Equal Employment Opportunity Commission (EEOC) having found "reasonable cause to believe a violations of the statute(s) occurred..." issued its notification of Plaintiff's right-to-sue the Defendants.

11. The right-to-sue letter was mailed by first class mail to Plaintiff on September 28, 2007 and Plaintiff received the letter on October 1, 2007. This Complaint was filed within 90 days of receiving the right-to-sue letter.

12. The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, and 28 U.S.C. § 1343(a) and pendent and supplemental jurisdiction over all state claims stated herein pursuant to 28 U.S.C. § 1367.

13. Plaintiff invokes the Court's pendant jurisdiction for determination of any violation of Wyoming Fair Employment Practices Act of 1965.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## FACTS

15. During all times pertinent hereto, Defendant has employed at least 15 or more employees.

16. Plaintiff is a member of a protected group in that he is a black male.

17. Beginning in and continuing since 1996, Plaintiff has been subjected to racial discrimination at his workplace by Defendant employees, supervisors and management.

18. Plaintiff became employed by Defendant as a meter reader in or about April 1990. In 1996, Plaintiff duties were changed to working at the service center/warehouse as a utility worker.

19. During the time in which Plaintiff worked in service centers/warehouses, his job performance was satisfactory or better and Plaintiff was never disciplined for any reason.

20. In November 27, 2000, became an Apprentice Lineman.

21. During his employment with the Defendant Company, Plaintiff has been called "ape" by other employees. A references to the color of his skin and hair. Fellow employees have spat on Plaintiff and have thrown dirt clods at him.

22. Because of the discrimination and ever increasing hostile environment, Plaintiff dreaded going to work, and at times actually became physically ill because of it.

3

23. Plaintiff works with powerful electric current and must rely in part in his fellow workers to be safe. Due to the continual racial slurs and harassment, Plaintiff did not feel safe at work.

24. As a result of his race, the Defendants, and each of them, failed and refused to train Plaintiff at the same rate and with same effort as other white apprentices.

25. In late 1994 and early 1995, Plaintiff began requesting training outside of the Cheyenne area in order to avoid the harassment in Cheyenne by his fellow workers, but also to receive adequate training and on-hands experience that he was being denied in Cheyenne.

26. In February, 1995, Defendants made false allegations against Plaintiff which were designed to cause a "strike" against him (see below definition).

27. Also in February, 1995, Plaintiff failed a test as the result of lack of training and hands-on experience which the Defendants were responsible for providing Plaintiff.

28. In late March, 2005, Plaintiff filed a complaint with International Brotherhood of Electrical Workers, Local Union 111, (IBEW) of which he was a member. The complaint alleged race and age discrimination.

29. The racial discrimination and harassment became so pervasive that it altered Plaintiff's working conditions of his employment. In April 2005, FJAC transferred Plaintiff to Ft. Collins, Colorado so that he could receive adequate training and experience in order to finish the Apprenticeship Program in July 2005.

30. Other similarly placed employees, non-minorities, did not have to leave Wyoming to receive training and were able to complete their training much quicker.

4

31. Plaintiff's training under the supervision of other personal, not of the Defendant company and its employees, was successful. Unfortunately, Plaintiff had to return to Defendant Company supervision in Cheyenne at the completion of his training in Ft. Collins, Colorado.

32. Because of his fear of retaliation for having filed the complaint with his Union, Plaintiff requested in August 2005, for permanent transfer from the Cheyenne area. Promises were made to accommodate the transfer, but Plaintiff never heard another word regarding the transfer.

33. During the time in which Plaintiff worked outside of Cheyenne, his job performance was satisfactory or better and Plaintiff was never disciplined for any reason.

34. Plaintiff continually complained to Defendant Dixon, (the "Electrical Operations Manager" and Line Supervisor during all times pertinent herein) and other Defendant Company management personnel of the discriminatory treatment he received from other employees, but his supervisors and other management personnel failed and refused to take necessary action to relieve or eliminate the discrimination.

35. The more the Plaintiff complained, the worse the discriminatory treatment continued. Additionally, the Plaintiff's supervisors gave Plaintiff a negative job performance evaluation in retaliation for Plaintiff's complaints to the Company and his local Union.

36. The negative job performance evaluation contained false information which the Defendants knew or should have known to be false. The purpose of the false evaluation, was to disqualify the Plaintiff from the Apprenticeship Program.

37. Plaintiff's complaints to his supervisor where not kept confidential, and therefore, the harassment increased after the supervisor informed the other employees of the complaints.

38. Plaintiff past his Journeyman test in July 2005.

39. After an extensive investigation, on August 15, 2005, Plaintiff's Union (IBEW) found that it was apparent that Local Union's Discrimination and Harassment Policy and Rule had been violated by both the employees and management members of the Defendant Company. Defendant Company and the other named Defendants herein were informed on the Union's findings.

40. In or about August, 2005, Plaintiff spoke with Defendant's Human Resources, Senior Vice President, James M. Mattern regarding his fear of returning to Cheyenne to work. Mr. Mattern told Plaintiff that he would work out a permanent transfer. Instead, Plaintiff was returned to duty in Cheyenne.

41. During the following two weeks after his return to Cheyenne, Plaintiff's job duties consisted of labor or apprentice type work, or he was sent out on jobs by himself or with a Hispanic minority apprentice, Ed Salazar, who was also suffering from on going discrimination.

42. Employees of Defendant Company began writing discriminatory slurs and offensive graffiti on Defendant Company property. As several examples: "KKK" was printed on the Company dumpster; "Real Lineman Don't Cry" was written on the bulletin board in the linemen's break room; "shut up nigger," "fuckin spicks," "Ed licks Tommys Balls" (a reference to Ed Salazar and Plaintiff) was written on the portable outhouses.

43. The slurs and graffiti were an attempt by Defendant Company employees to humiliate and intimidate the Plaintiff.

44. In short, the racial and hostile environment continued, even after the Union's findings, and management did little or nothing to correct the situation.

45. The hostile work environment/discrimination created tremendous emotional suffering and continued to cause the Plaintiff to be physically ill. Due to the dangerous nature of Plaintiff's job and the need to trust other lineman down the line, Plaintiff believed that his health and life were at risk.

46. As a result of the unchecked discrimination, intimidation, harassment, failure to train the Plaintiff because of his race and color, retaliation and general hostile work environment, Plaintiff was left with no choice but to resign from his position with the Defendant Company on October 3, 2005.

47. Plaintiff alleges that he was constructively discharged from his employment because he was treated differently as a result of his color and race.

48. Plaintiff filed his Charge of Discrimination on October 3, 2005, with the State of Wyoming.

49. In his Charge of Discrimination, Plaintiff alleged racial and age-based discrimination and retaliation.

## FIRST CAUSE OF ACTION
## VIOLATION OF CIVIL RIGHTS ACT OF 1964

50. Plaintiff realleges paragraphs 1 through 49 as if fully set forth herein.

51. The Plaintiff was, and is, physically and mentally capable of performing the duties as an Apprentice Lineman and as a Journeyman Lineman.

52. The Defendants deprived the Plaintiff of the same training opportunities necessary to complete his apprenticeship and move to Journeyman as it did similarly situated non-minority employees because of Plaintiff's race and color.

7

53. Each apprentice employee of Defendant Company receives training and evaluation from journeymen assigned to that apprentice for any given job.

54. An Apprentice is rated monthly as follows: a rating of 1-3 is "below step;" 4-6 is "at step" and 7-9 is "above step."

55. If an Apprentice receives three "strikes" during his apprenticeship, then he is washed out of the Apprenticeship Program.

56. It is one of Defendant Dixon's duties to make sure that each employee of Defendant Company performs his/her duties in keeping with the Company's rules and regulations as well as State and Federal regulations.

57. Defendant Kevin Hahn was an employee of Defendant Company. In addition to his other duties, Defendant Hahn was the Functional Apprentice Representative (FAR). It is the Functional Apprentice Representative's duty to ensure that the various apprentices within the Defendant Company receive the training and experience necessary to complete the apprenticeship program.

58. Plaintiff received his second "strike"[1] on February, 2005 because he did not complete a part of a "breakout exam." The second strike resulted in a six month hold on his Apprenticeship Program.

59. In March 2005, Plaintiff was given two reviews (review dates 3/01/05 and 3/20/05) instead of one that all other apprentices received. During these reviews, Plaintiff received mostly ratings of 3 or "below step" ratings. One of the reasons given was that he had opened a primary or secondary neutral. The incident allegedly happened in late February, 2005. The alleged

---

[1] Plaintiff's first strike was for absenteeism in June 2003.

8

opening of the neutral was counted against the Plaintiff in both reviews even though it was an allegedly single act which did not occur during the interim period between the two reviews.

60.  The March, 2005 reviews would have resulted in a third strike and Plaintiff would have washed out of the Apprenticeship Program.

61.  During the same period of time when the Defendant Company rated Plaintiff "below step" in all the important areas of the Program, Plaintiff also worked in the Ft. Collins area under the supervision of a completely separate team of Xcel employees. The Ft. Collins group consistently gave Plaintiff a rating of 8, which is a "above step" rating.

62.  The Ft. Collins group is critical of the Defendant Company employees, Defendant Dixon and Defendant Hahn because they failed to provide the Plaintiff with the necessary training, experience and feedback to assist Plaintiff in acquiring the skills needed to pass the breakout test. They are also critical of the evaluation and opportunity to meet and discuss discrepancies and differences in the monthly reviews.

63.  As a result of the March, 2005, discrepancies in ratings between the Ft. Collins group and the Defendant Company as well as the failed breakout exam in February 2005, the Electrical Functional Joint Apprenticeship Committee (FJAC), a committee organized to oversee the Apprenticeship Program for all of Xcel Energy apprentice candidates, set a meeting up in which the Plaintiff and Defendant Dixon, as well as others, were requested to attend.

64.  FJAC concluded that rather than issuing a third strike against Plaintiff, that he would finish his training in Ft. Collins, that he would test in July and that, if he failed, he would be removed from the program.

9

65. Plaintiff completed the program under the training and supervision of the Ft. Collins group and received his Journeyman certificate in July, 2005, on schedule and without further delay of conflict.

66. Also in March 2005, Plaintiff filed a complaint of discrimination with his Union. Defendant Company retained the services of Mountain States Employer's Council to complete a "joint investigation" with Plaintiff's Union ( IBEW, Local Union's Human Rights Committee) regarding the allegations raised by Plaintiff.

67. The findings of the "joint investigation" were set forth in a letter from the Union Business manager on August 15, 2005. The letter stated in part:

> co-workers do not want [Plaintiff] to complete the Apprenticeship Program because of his race. The investigation revealed that the Electric Operations Manager, Wayne Alan Dixon has advised, directed or otherwise insinuated to the Journeyman Lineman that [Plaintiff] will not make a good Lineman. This is contrary to what the Lineman who have trained him in Ft. Collins, Greeley, Golden and Aurora areas have to say. Additionally, the situation may have risen to a hostile work environment.

68. A copy of the August 15, 2005, letter was mailed and received by Defendant Mattern, Senior Vice President, Black Hills Corporation.

69. Defendant had knowledge as a result of the "joint investigation" conducted by its own investigative service, Mountain States Employer's Council, that the allegations of race discrimination had occurred and was occurring against the Plaintiff, yet Defendants did little or nothing to end the discrimination.

70. The facts outlined above regarding the "KKK" written on Company property all occurred after August, 2005.


71. To the Plaintiff's knowledge and belief, as of the date the Plaintiff was constructively discharged from the Defendant Company employment in October 2005, not one of the co-workers or named Defendants herein had been reprimanded, punished or terminated as a result of their obvious and blatant discriminatory practices aimed at the Plaintiff.

72. In early September, 2005, shortly before obtaining his Journeyman certificate, Plaintiff contacted Defendant Mattern regarding permanent placement in the Ft. Collins area or elsewhere. Plaintiff explained to Mr. Mattern that the treatment he had been receiving from the other employees of the Defendant Company would continue and that his health and life were not safe in Cheyenne.

73. As Senior Vice President of Human Resources for Defendant Company, Mr. Mattern was aware of the allegations and the findings of the "joint investigation." Yet, Defendant Mattern did nothing to assist or facilitate the transfer request.

74. Defendant Wayne Alan Johnson as the Electrical Operations Manager for Defendant Company reported to and was supervised by Defendant Ted Massey. Defendant Ted Massey was the Director of Retail Electric Distributions for Defendant Company and reported to and was supervised by Defendant Stuart Wevik, Vice President of Retail Operations for Defendant Company.

75. Each of the Defendants had a duty to provide a non-discriminatory and non-hostile work environment and to protect the Plaintiff from racial discrimination.

76. Each of the Defendants participated in and/or knew or should have known of the race discrimination and hostile work environment created and carried out by Defendant Company's employees, including management.

11

77.	Each of the Defendants failed to protect the Plaintiff from race discrimination and hostile work environment while employed by Defendant Company.

78.	The Civil Rights Act of 1964, and 42 U.S.C. § 2000e-2(a)(1) provides that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color ...." See 42 U.S.C. § 2000e-2(a)(1).

79.	The Plaintiff is entitled to be free from such discrimination pursuant to 42 U.S.C. § 2000e-2(a)(1).

80.	The Civil Rights Act of 1964, and 42 U.S.C. § 2000e-2(a)(2), provides that "[i]t shall be an unlawful employment practice for an employer ... to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color...."

81.	The Plaintiff is entitled to be free from such discrimination pursuant to 42 U.S.C. § 2000e-2(a)(2).

82.	The Defendants' conduct violated Plaintiff's right to be free from discrimination in the workplace.

83.	The Defendants discriminated against the Plaintiff by not providing a discriminatory free work environment, by not providing the same training opportunities as it did to other non-minority similarly situated employees and by failing to take action against those who discriminated against Plaintiff on basis of his race and color.

84.	Such conduct violates the Civil Rights Act of 1964, and 42 U.S.C. § 2000e et seq.

85. The Plaintiff has suffered serious economic losses and mental suffering as set out below in his prayer for relief.

86. Plaintiff also seeks reasonable attorney's fees and legal costs, including expert witness fees, pursuant to Title 42 U.S.C. § 42 U.S.C. § 2000e.

## SECOND CAUSE OF ACTION:
## VIOLATION OF 42 U.S.C. § 1981 - RETALIATION

87. Plaintiff realleges paragraphs 1 through 86 as if fully set forth herein.

88. Plaintiff brought legitimate complaints in opposition to discrimination leveled at him and other minorities who were employed by the Defendant prior to February, 2005. In particular, but not limited to, the Plaintiff complained that he had been denied the training and experience necessary to complete the breakout test in February, 2005 and that the lack or training on denial of hands-on experience was the result of his color and race. None the other Journeymen Linemen were black, and none of the other Journeymen Linemen were non-white, with exception of one Hispanic who had transferred to Cheyenne as a Journeyman and one Hispanic who was a Line Foreman.

89. As a result of his complaints, in February 2005, Defendants Dixon and Hahn submitted a false report that Plaintiff had cut a primary neutral. Later they changed the story to cutting a secondary neutral.

90. At Plaintiff's monthly review on March 1, 2005, Defendants Dixon and Hahn used the alleged incident in an attempt to cause Plaintiff to incur his third and final strike.

91. The Defendants held a second review meeting on March 20, 2005, and again raised the same allegation as though Plaintiff had cut a second secondary neutral.

92. Plaintiff believes and so asserts that Defendants have never held a second monthly review of any other Apprentice in the Apprenticeship Program.

93. It is also common practice in the Apprenticeship Program to allow the Apprentice in question the opportunity to discuss, debrief and develop common goals and plans necessary to correct errors as alleged in this matter. Plaintiff was not given any of those opportunities.

94. At the conclusion of the second monthly review meeting, the Defendants issue Plaintiff his third strike.

95. The purpose for the false performance evaluation was to cause the Plaintiff to be terminated from the apprentice training program, and thus causing the end of his employment with the Defendant.

96. Plaintiff complained to FJAC (the Committee responsible for overseeing the entire Apprenticeship Program) and a meeting was set up in April in which the Defendants and the Plaintiff were present. FJAC reversed the decision to issue the third strike, put a six month hold on Plaintiff's program, sent him to Ft. Collins for training and allowed him to test in July, 2005.

97. Plaintiff filed his complaint alleging racist treatment by the Defendants and Defendant Company. As stated in Count I, his allegations of racism were confirmed at the end of the "joint investigation" in August, 2005.

98. The retaliation did not stop. Plaintiff requested a transfer through the Defendant Company Human Resource Department. Plaintiff spoke to several people including Defendant Mattern, Senior Vice President of Human Resources for Defendant Company.

99. Defendant Mattern promised to do what he could to transfer Plaintiff out of Cheyenne and to Colorado, but no effort was made to do so.

14

100. Plaintiff was returned to Cheyenne in September, 2005. The retaliation upon his return is set forth above in the facts and Count 1.

101. Title 42 U.S.C.A. § 1981 (a) provides that:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

102. The Defendants, and each of them, took steps to run the Plaintiff out of the Apprenticeship Program by using deception, delay in training and on-hands experience because he continually complained about the racially charged and hostile work environment.

103. After the "joint investigation" conducted by the Union and the Defendant Company, Human Resources and Defendant Mattern knew, or should have known, that returning Plaintiff to Cheyenne would result in continual harassment by the Defendants, and each of them. Plaintiff believes and so asserts that his transferred was denied as a response to and in retaliation for his complaint filed with the Union.

104. Such conduct violates 42 U.S.C.A. § 1981 et seq.

105. The Plaintiff has suffered serious economic losses and mental suffering as set out below in his prayer for relief.

106. Plaintiff also seeks reasonable attorney's fees and legal costs, including expert witness fees, pursuant to Title 42 U.S.C. § 42 U.S.C. § 2000e.

### THIRD CAUSE OF ACTION - CONSPIRACY TO VIOLATE ANTI-DISCRIMINATION ACT

107. Plaintiff realleges paragraphs 1 through 106 as if fully set forth herein.

15

108.   Pursuant to Title 42 U.S.C. § 1985(3),

If two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

109.   As set forth above in the facts, Count I and Count II, the Defendants Wayne Alan Dixon, Kevin Hahn and other Defendant Company employees conspired and joined together to deprive Plaintiff with the training and on-the-job training necessary to move through the Apprenticeship Program (Program) because of his race.

110.   More specifically, Kevin Hahn, the FAR, had a duty to assist Plaintiff through the Program. Instead he wrote up a false allegation that Plaintiff had cut a secondary neutral. While cutting the secondary neutral is a serious act, it in itself does not lead to a strike against the Apprentice. Defendant Dixon took the false report, which he knew was false, and used it, not once but twice, to cause the Plaintiff to be terminated from the Program.

111.   As set forth above in the facts, Count I and Count II, That Defendants Wayne Alan Dixon, Kevin Hahn and other Defendant Company employees conspired and joined together to harass, assault, embarrass and create a hostile work environment for the Plaintiff because of his race.

112.   That each person in the United States has a right guaranteed by the United States Constitution of equal protection or equal privileges and immunities to seek and obtain employment

16

in any area in which they are otherwise qualified. It was the Defendants' and others objective to deprive the Plaintiff of his right to fair employment opportunities.

113. As a result of the Defendants and the Defendant's co-conspirators deprivation of Plaintiff's rights, the Plaintiff remained an Apprentice for two years longer than necessary and ultimately was constructively discharged from his employment.

114. The Plaintiff has suffered serious economic losses and mental suffering as set out below in his prayer for relief.

115. Plaintiff also seeks reasonable attorney's fees and legal costs, including expert witness fees, pursuant to Title 42 U.S.C. § 42 U.S.C. § 2000e.

## FOURTH CAUSE OF ACTION
## PUNITIVE DAMAGES

116. Plaintiff realleges paragraphs 1 through 115 as if fully set forth herein.

117. Pursuant to the Civil Rights Act of 1964, and 42 U.S.C. § 2000e, the Defendants knowingly and intentionally engaged in unlawful discrimination against the Plaintiff on the basis of race and color, committed a violation of Title 42 U.S.C. § 2000e-2(a)(2) of the Act, against the Plaintiff. Plaintiff is entitled to recover punitive damages. 42 U.S.C.A. § 1981a(a)(b).

118. Plaintiff's right to work and not be discriminated against because he is black is a federally protected right. 42 U.S.C. § 42 U.S.C. § 2000e.

119. Plaintiff's claims of discrimination were known to the Defendants, yet Defendants used those complaints as a reason to further harass the Plaintiff, by creating false and negative performance reviews, and to otherwise create such a hostile work environment that Plaintiff eventually was forced to resign.

120.  No non-minority who had a similar work record suffered this type of treatment and the hands of the Defendants and Defendant Company.

121.  Defendant discriminated against the Plaintiff based on his race and color.

122.  Defendant engaged in discriminatory practice(s) with malice and/or reckless indifference to the federally protected rights of the Plaintiff.

123.  The Plaintiff has suffered serious emotional and mental suffering and is entitled to treble damages herein.

### FIFTH CAUSE OF ACTION - Pendent Claims

124.  The Plaintiff re-alleges paragraphs 1 through 124 as if fully set forth herein.

125.  The Wyoming Fair Employment Practices Act prohibits unfair and discriminatory employment practices based on an individual's race and or color. Wyo. Rev. Stat. § 27-9-101, et seq.

126.  The conduct of the Defendant, its agents and representatives, as heretofore alleged, violates the provisions of the Wyoming Fair Employment Practices Act and the Plaintiff is entitled to compensation in the form of compensatory and punitive damages as alleged herein.

**WHEREFORE**, the Plaintiff respectfully prays the Court enter judgment in favor of Plaintiff. The Plaintiff has suffered serious economic losses and mental suffering as a result of Defendants' intentional conduct as heretofore alleged and seeks compensation for:

    a.  Past, present, and future lost wages from the date of his forced constructive discharge;

    b.  The value of past, present, and future lost employment benefits;

  c. Prejudgment interest on lost wages and benefits from the date of his constructive discharge;

  d. Emotional stress and anxiety, mental anguish, loss of enjoyment of life, inconvenience;

  e. Plaintiff also seeks reasonable attorney's fees and legal costs, including expert witness fees, pursuant to Title 42 U.S.C. § 42 U.S.C. § 2000e;

and such other additional relief as the Court may deem to be just and equitable in the circumstances.

The Plaintiff hereby requests a jury of six (6) persons to decide all issues triable to a jury.

**DATED** this 31st day of December, 2007.

          Tommie C. Draper,
          PLAINTIFF.

       BY: _____
          Donald E. Miller
          Graves, Miller & Kingston, P.C.
          408 West 23rd Street
          Cheyenne, Wyoming 82001
          (307) 638-8885
          Attorney for Plaintiff